United States District Court
Southern District of Texas
**ENTERED**
August 18, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NATHANIEL PRADIA, | § | |
| TDCJ #02369209, | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:24-CV-01045 |
| | § | |
| ERIC GUERRERO,[1] | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Petitioner Nathaniel Pradia (TDCJ #02369209) is currently in custody of the Texas Department of Criminal Justice (TDCJ). He filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 2021 state conviction and sentence for murder. Doc. No. 1. Respondent filed an Answer, Doc. No. 10, and Pradia filed a response in opposition, Doc. No. 12. After having carefully considered the pending motion, response, record, and applicable law, the Court GRANTS Respondent's motion for summary judgment and DISMISSES this petition with prejudice for the reasons that follow.

[1] Bobby Lumpkin was the previous named respondent in this action. Eric Guerrero has succeeded Lumpkin as Director of the Texas Department of Criminal Justice, Correctional Institutions Division. Under Rule 25(d) of the Federal Rules of Civil Procedure, Guerrero is automatically substituted as a party.

## I. BACKGROUND

On November 5, 2021, Pradia was convicted of murder after a jury trial in Harris County cause number 1599590 and sentenced to 25 years in prison. Doc. No. 11-2 at 247, Clerk's Record Vol. I ("I CR") at 636-38 (Judgment). An intermediate appellate court affirmed his conviction. *See Pradia v. State*, No. 14-21-00661-CR, 2023 WL 3596252 (Tex. App.—Houston [14th Dist.], May 23, 2023, no pet.) (mem. op.). The appellate court summarized the case on appeal:

> Appellant was charged with the murder of Jeremy Gregory and pleaded not guilty. At the time of the murder, appellant was living with his girlfriend, Rachel. Appellant and Rachel dated for a time and broke up. During their break-up, Rachel dated Jeremy. Ultimately, Rachel ended the relationship with Jeremy and resumed her relationship with appellant. Appellant admitted to shooting Jeremy in the driveway of Rachel's home. Appellant's defensive theory was that he shot Jeremy in self-defense during an argument. Appellant raised this theory in his opening statement, indicating that the evidence would show that Jeremy was much larger than appellant, came to the house uninvited, and appellant was "in fear for his life" when he shot Jeremy.

*Pradia*, 2023 WL 3596252, at *2.

Over defense counsel's objection, the prosecution presented text messages between Pradia and Rachel, including one text thread where Pradia appears to threaten to kill both Rachel and Jeremy. *Id.* Rachel testified at trial regarding the texts and what happened on the day of the murder:

> Rachel testified regarding the text messages and read the text messages to the jury. She testified that the messages were sent by appellant when she was dating Jeremy and that "white boy" referred to Jeremy. Rachel testified she was alarmed that appellant would threaten to kill anyone but that she continued to talk to appellant because she loved him. She testified that shortly after the text exchanges she and Jeremy broke up and she resumed her relationship with appellant.

Rachel testified that after she and appellant resumed their relationship, appellant was still upset about Rachel's relationship with Jeremy, and it was an "ongoing issue." She and appellant would fight about the prior relationship, and appellant was angry. On one occasion during such a fight the police were called. Rachel testified that appellant would continue to instigate "verbal disagreements" with her regarding Jeremy until the day of the murder.

Rachel testified that on the morning on the day of the murder she received a text message from Jeremy. In response to this message, she deleted Jeremy's text and "blocked" his number. She testified that she was concerned appellant would see the message or hear a missed call and it would "be a problem." In the early afternoon, Rachel received a phone call from a number she did not recognize. She answered the phone and heard Jeremy's voice respond. She testified that she got off the phone with him quickly because appellant was nearby, and she was worried about his reaction. Rachel testified that she blocked this phone number as well because she was worried about having another disagreement with appellant.

Rachel testified that she went about her day, running errands while appellant did some yard work at the house. When she stopped at home between errands, she and appellant were talking in the garage. At this point appellant told Rachel that he just saw the "white boy" drive by the house, meaning Jeremy. Rachel testified that appellant "insisted" that Jeremy had driven past the house and asked her, "You think I don't know what this big retarded motherfucker looks like?" Appellant then began another argument with Rachel. Rachel testified that to "dispel the argument that I knew was growing, we both go in the house so that he can go with me to run errands."

After appellant changed his clothes, they both went back to the garage and got into Rachel's car. Rachel testified that she keeps a gun in the glovebox of her car. Rachel was in the driver's seat and appellant was in the passenger's seat. They were about to leave when appellant saw Jeremy walking up the driveway. Appellant quickly got out of the car saying to Rachel, "I told you it was that motherfucker." Appellant confronted Jeremy in the driveway. Rachel testified that Jeremy was just walking up the driveway at a "regular pace." Rachel followed appellant into the driveway and yelled at Jeremy to leave. She testified that she was telling Jeremy to leave because "I know [appellant]." Rachel testified that appellant never went back to the car after the altercation began.

> Rachel testified that everything happened very quickly—all three were arguing and yelling at one another when appellant shot Jeremy. Rachel grabbed appellant while Jeremy ran back to his vehicle and attempted to get in on the driver's side, but appellant followed Jeremy and shot him two more times. Rachel testified that Jeremy raised his arms to shield his body when appellant shot at him. Rachel testified that she then retreated to the house to call for help and wanted to help Jeremy, but she was too scared of what appellant would do to her if she tried. Rachel testified that no physical altercation occurred between any of the parties prior to the shooting and that they were all just yelling at one another. She also did not see Jeremy with any weapon.
>
> In his closing statement, appellant argued that at the time of the argument he had a reasonable fear for his own safety because Jeremy was almost twice appellant's size and had confronted him at his and Rachel's home. Appellant further argued that he had a reasonable fear that Jeremy was returning to his vehicle to obtain a weapon and that is why he continued to shoot at him. After considering the evidence, the jury convicted appellant of murder.

*Id.* at *3–4. The intermediate appellate court overruled Pradia's issues and affirmed his conviction. He did not file a petition for discretionary review in the Texas Court of Criminal Appeals. *See* Doc. No. 10-1 at 2.

Pradia filed a state application for a writ of habeas corpus on October 16, 2023. Doc. No. 11-20 at 24, State Habeas Corpus Record ("SHCR") at 00021. His application was denied without written order on January 24, 2024. *See Ex Parte Pradia*, WR-95,336-01 (Tex. Crim. App. Jan. 24, 2024); Doc. No. 11-22 (Action Taken Sheet). This federal petition followed.

Pradia was represented by Ms. Silvia Escobedo, who was appointed counsel in July 2018. Doc. No. 11-1 at 16, I CR at 16. Escobedo requested co-counsel in January 2020, and Cary Lynn Higginbotham Hart was appointed as co-counsel to assist Escobedo. *Id.* at 220-24.

In his sole ground for relief in his federal petition, Pradia claims: "Counsel knowingly and intentionally set in motion a series of events which she knew would deprive her client, the Defendant, of effective assistance of counsel." Doc. No. 1 at 5. He further states:

> On or about October 21, 2021, I filed a pro se motion to dismiss my court appointed attorney and the trial court abused its discretion by failing to conduct a hearing and forcing me to proceed with trial. I specifically informed the trial court of the fact that my attorney had remained confrontational and unapproachable in the last few years prior to trial. I also brought it to the court's attention that my attorney knew about due process violations for years and yet she had taken no affirmative action to preserve and protect my rights.

*Id.*

## II. <u>LEGAL STANDARDS</u>

### A. <u>Habeas Corpus Review under AEDPA</u>

The writ of habeas corpus provides an important, but limited, examination of an inmate's conviction and sentence. *See Harrington v. Richter,* 562 U.S. 86, 103 (2011) (noting that "state courts are the principal forum for asserting constitutional challenges to state convictions"). The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), codified as amended at 28 U.S.C. § 2254(d), "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt"; it also codifies the traditional principles of finality, comity, and federalism that underlie the limited scope of federal habeas review. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quotations omitted).

AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Harrington,* 562 U.S. at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99. For AEDPA to apply, a state court need not state its reasons for its denial, nor must it issue findings, nor need it specifically state that the adjudication was "on the merits." *Id.* at 98-99.

To the extent that the petitioner exhausted his claims, they were adjudicated on the merits by state courts. This Court, therefore, can only grant relief if "the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins,* 560 U.S. 370, 378 (2010) (quoting 28 U.S.C. § 2254(d) (1)). The focus of this well-developed standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). Where a claim has been adjudicated on the merits by the state courts, relief is available under § 2254(d) *only* in those situations "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. *Harrington*, 562 U.S. at 102.

Whether a federal habeas court would have, or could have, reached a conclusion contrary to that reached by the state court on an issue is not determinative under § 2254(d).

*Id.* ("even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable."). Thus, AEDPA serves as a "guard against extreme malfunctions in the state criminal justice systems," not as a vehicle for error correction. *Id.* (citation omitted); *see also Wilson v. Cain,* 641 F.3d 96, 100 (5th Cir. 2011). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102.

"Review under § 2254(d)(1) focuses on what a state court knew and did." *Cullen v. Pinholster,* 563 U.S. 170, 182 (2011). Reasoning that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," *Pinholster* explicitly held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 185. Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.*

### B. <u>Ineffective Assistance of Counsel</u>

The Constitution guarantees a fair trial for criminal defendants through the Due Process Clause, but the Sixth Amendment, which conveys the right to have the effective assistance of counsel, largely defines the basic elements of a fair trial. *See* U.S. CONST. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 685 (1984); *see also McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (observing that "the right to counsel is the right to the effective assistance of counsel"). Claims for ineffective assistance of counsel are analyzed under the following two-prong standard:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. Thus, to prevail under the *Strickland* standard, a defendant must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency. *See Williams v. Taylor*, 529 U.S. 390, 390-91 (2000).

The first prong of the governing standard is only satisfied where the defendant shows that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687. Scrutiny of counsel's performance must be "highly deferential," and a reviewing court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *See United States v. Molina-Uribe*, 429 F.3d 514, 518 (5th Cir. 2005) (citing *Strickland*, 466 U.S. at 687-88), *cert. denied*, 547 U.S. 1041 (2006). In the Fifth Circuit, "federal habeas review of a state court's denial of an ineffective-assistance-of-counsel claim is 'doubly deferential' because we take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." *Rhoades v. Davis*, 852 F.3d 422, 434 (5th Cir. 2017).

To prove prejudice, the second prong under *Strickland*, a defendant must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## III. DISCUSSION

In his federal petition, Pradia asserts one ground for habeas relief that could be liberally construed as asserting two claims. First, Pradia claims that trial counsel was ineffective, stating generally that counsel "set in motion a series of events that she knew would deprive her client, the Defendant, the right to effective assistance of counsel." Doc. No. 1 at 5. He complains that counsel was "confrontational and unapproachable in the last few years prior to trial" and "knew about due process violations for years and yet she had taken no affirmative action to preserve and protect my rights." *Id.* He does not elaborate on or state facts to indicate what events were set in motion, how they deprived him of effective assistance, or what due process violations counsel allegedly ignored or failed to protect.

Second, he alleges that the trial court abused its discretion by not granting a hearing on his motion to dismiss his attorney and forcing him to proceed to trial. *Id.* He did not raise this record claim on direct appeal.

Respondent contends that Pradia failed to exhaust any of these claims in state court properly and that they are now procedurally barred. Respondent further argues that even if Pradia had properly presented his claims, they fail on the merits.

### A. <u>Trial court record claim is procedurally barred and meritless.</u>

"A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022). "When the prisoner has failed to do so, and the state court would dismiss the claim on that basis, the claim is 'procedurally defaulted.'" *Id.* Under the procedural bar doctrine, "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thompson,* 501 U.S. 722, 732 (1991). The adequate and independent state ground doctrine affords state courts the opportunity to address and correct alleged violations of federal rights, "for without it, 'habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court.'" *Walker v. Martin,* 562 U.S. 307, 316 (2011) (quoting *Coleman,* 501 U.S. at 732).

Generally, a federal court cannot review the merits of a state prisoner's habeas petition if the claims in the petition are procedurally defaulted. *See, e.g., Magwood v. Patterson,* 561 U.S. 320, 340 (2010) ("If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention—whether in trial, appellate, or habeas proceedings, as state law may require—procedural default will bar federal review."). "Determining whether a petitioner exhausted his claim in state court is a case- and fact-specific inquiry." *Moore v. Quarterman,* 533 F.3d 338, 341 (5th Cir. 2008) (en banc).

Pradia does not present his claim that the trial court abused its discretion in denying his motion to dismiss his attorneys on direct appeal, nor did he file a petition for discretionary review to exhaust that claim (or any other record claim). A careful review of his state habeas application shows that he only mentions the motion to dismiss his trial counsel briefly and claims that the trial court "abandoned its duty to be a neutral independent fact finder during a dispute between the applicant and his attorneys." Doc. No. 1-1 at 7 (State Habeas Application at 7). However, a record claim regarding a pre-trial motion must be presented on direct appeal and is not cognizable on state habeas review. *See Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004) (explaining that Texas's procedural rule that record claims must be brought on direct appeal is "firmly established and regularly followed"). Pradia does not show that he properly presented this claim in Texas state court on direct appeal and does not otherwise overcome the procedural bar.

Moreover, even if this claim were not procedurally barred, it would fail on the merits because, among other things, the record belies this claim. The record reflects Pradia did not move for dismissal of his lawyers until the eve of trial in October 2021 and that he stated in open court before his arraignment on October 27, 2021, two days before jury selection, that he wanted his counsel to represent him. During his arraignment, Pradia did not mention the motion he had sent to the court that reportedly was mailed before the arraignment and arrived on October 28, 2021, but trial counsel raised the issue of Pradia's dissatisfaction with trial counsel to the judge. Pradia had an opportunity to speak with the trial judge on the record at the arraignment regarding his frustration with his attorneys:

THE DEFENDANT: I was just unaware of what's going on because it's very seldom, if at any time, that my attorneys tell me anything. So I don't know what's going on. My attorney, Ms. Escobedo, made it very clear to me that I didn't have a chance if I had a trial or any type of situation at NRG and I wouldn't have any chance of my case being effectively heard or anything like that. So I was under the impression that we were having the trial there and not just picking the jury.

THE COURT: Yes, sir. Just the –

THE DEFENDANT: Just the jury?

THE COURT: Yes, sir. Right. Just the jury selection.

THE DEFENDANT: Okay. That's all I wanted to know. Actually, the bailiff had to explain it to me, what was going on over there because my attorneys never did.

MS. HART: I normally do not say anything when my client speaks up, but I spent two hours in the jail, not this past Sunday but the Sunday before; and I explained all of this to him. Ms. Escobedo and I spent two or more hours at the scene with our client going over all of this. So him telling the Court that we haven't given him any indication of what is going on is wholly untrue.

THE DEFENDANT: I don't have any reason to lie.

THE COURT: Here's what we're not going to do -- okay. I know that your attorneys are meeting with you because they tell me that they are. They have filed motions to come visit you.

THE DEFENDANT: When? When? When have they come to see me?

THE COURT: We're not going to do an argument. Okay? Ms. Higginbotham and Ms. Escobedo went to see you on Monday. They waited for an hour and a half and then were kicked out by the jail because of a fire that was started by someone in custody. They've met with you, it sounds like, on the Sunday before that in anticipation of trial; and then, I believe, before we had the hearing to revoke your bond, y'all all went to the scene together. Is that all correct?

MS. HART: Yes. I believe it was after, actually.

THE COURT: Right. There were two hearings. There was the original hearing that I denied revoking your bail, and then there was the subsequent issue with the monitor. Is there anything else that we need to talk about while we're all here on the record, either from -- As you know, Mr. Pradia, you are being held without bail, legally, but you're being held without bail. So the Court wants your case to move to resolution. I do not want to hold you pretrial. The indication that I have from your attorneys -- and I have no reason not to believe them, having known them for decades at this point and them being officers of the court, is that they're meeting with you and actively investigating your case. They may have missed you on Monday, but through no fault of their own. As a defense attorney, I can tell you that I sometimes waited hours before the jail brought my client down and I sometimes had to leave before seeing them. We still have -- today is Wednesday. We have today, tomorrow; and then on Friday is just jury selection and we start testimony on Monday. So that's where we are. Do you have any questions for me?

MS. ESCOBEDO: Judge, I would like to put two things on the record.

THE COURT: Yes, ma'am.

MS. ESCOBEDO: Due to the fact that this morning I received notification that he has contacted The State Bar with all kinds of allegations of my representation. So, first of all, I want to address the NRG issue while we're on the record. Mr. Pradia, are you agreeing to pick a jury at NRG on Friday?

THE DEFENDANT: Yes, ma'am, I am. I thought we were having the trial there.

THE COURT: I totally get that confusion. This entire thing is confusing.

MS. ESCOBEDO: Second, in your letter to The State Bar, you said that you wanted me removed as your attorney. Since that is now out there as part of your file, **<u>you need to address that with the Court. Do you still want me to remain on your case, or not</u>**? I'm not saying you get to choose; but you need to put it on the record and have the Judge make the decision.

THE DEFENDANT: **<u>I want you to represent me, as my attorney</u>**; and I want us to be on the same page and you not yelling and cussing me out every time we speak. Because that's what happens.

THE COURT: I assume –

> THE DEFENDANT: And you don't want me to ask any questions in regards to my life. This is my life on the line. It's every time we speak.
>
> THE COURT: I assume, Ms. Escobedo, that your response would be that that has not happened?
>
> MS. ESCOBEDO: Correct. And I have explained everything to him. He keeps saying he wants us to be on the same page. We're not -- I told him we're not ever going to be on the same page. I'm not here to be your friend. We've explained the law and issues regarding his statements and whatnot and evidence. And, like, we're trying to explain to him legally what we can do in a trial and legally how we think a trial would proceed. He doesn't like a lot of the things that Ms. Hart and I are telling him when we are advising him. So he thinks we're not on the same page. There are some things that he wants us to do that we cannot do, so we're not on the same page. And I've explained to him that we're not ever going to be on the same page. We're his lawyers. We will represent him. Cary and I have been working countless hours over the past -- since he's been in custody, knowing that we are going. We have talked to Mary Grace, the DA, almost daily about everything on the case.
>
> THE COURT: I know. I see y'all in here working on the case actively over the last few weeks.

Doc. No. 11-5 at 6:20-11:23, 2 RR 6-11 (Arraignment) (emphasis added). The trial court then went off the record to allow Pradia to speak with his attorneys about their attorney/client relationship privately. *Id.* at 12:1-5.

As the above exchange reflects, Pradia stated in court that he wanted to proceed with jury selection as scheduled and he wanted trial counsel "to represent [him], as [his] attorney." *Id.* at 10:15-16. He did not ask the judge to remove either of his two attorneys, and he did not ask for a hearing on the motion at the time he was face-to-face with the judge. Pradia fails to demonstrate any abuse of discretion from the judge and fails to meet his burden to show that he is entitled to federal habeas relief on this claim.

**B. The ineffective assistance claim is conclusory and meritless.**

Pradia claims, without elaboration, that trial counsel was "confrontational and unapproachable" and set in motion events to deprive him of effective assistance of counsel. He does not allege any specific facts to support these claims in his federal petition. The Fifth Circuit has explained that "Federal habeas petitions must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Harper v. Lumpkin*, 64 F.4th 684, 691 (5th Cir. 2023) (quoting *Mayle v. Felix*, 545 U.S. 644, 655 (2005); Rule 2(c), Rules Governing § 2254 Cases)). "[C]onclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." *Id.* (quoting *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)). Thus, his ineffective assistance of counsel claims are subject to dismissal as conclusory based on the federal petition.

A review of the allegations in Pradia's state application does not cure the deficiencies in his claims, either. In his state application, he broadly alleges that counsel did not return phone calls, made some decisions without consulting him, ignored his wishes, and filed motions without his knowledge. Even if the Court considered his allegations against counsel in his state application, he does not show ineffective assistance of counsel, nor does he show that the State's rejection of his claim is contrary to, or an unreasonable application of *Strickland*.

In his state application, Pradia complains that counsel: (1) filed a motion for co-counsel without his knowledge; (2) filed a motion in limine to limit the State's use of his

statement to police, which he claims was exculpatory; (3) failed to keep him informed about the investigation and filed a motion for an investigator without his knowledge; (4) lacked a command of the facts and the law and did not ask for a reset to postpone the trial; (5) failed to develop the facts to support his self-defense claim; (6) did not put on witnesses in his favor; and (7) did not cross-examine Rachel adequately.

The record shows that the Texas Court of Criminal Appeals denied Pradia's habeas application without written order. *See Ex Parte Pradia*, WR-95,336-01 (Tex. Crim. App. Jan. 24, 2024) (denying the state application without written order); Doc. No. 11-22 (Action Taken Sheet). Therefore, his ineffective assistance of counsel claims were adjudicated on the merits in state court, and AEDPA deference applies to these claims. *Harrington*, 562 U.S. at 99-100 (explaining that the state highest court's one-line denial of state habeas petition, without giving reasons for that denial, was a decision on the merits entitled to AEDPA deference). To the extent that Pradia's vague, conclusory allegations refer to his allegations in his state application, he does not show that the state court's adjudication of his ineffective assistance of counsel claims were contrary to or an unreasonable application of *Strickland*, as explained below.

Regarding Pradia's claims that trial counsel filed various motions without his knowledge, Pradia neither shows that such actions fell below reasonable standards such that they could be considered deficient performance, nor demonstrates that filing such motions caused him actual harm. Pradia does not show how having a second attorney to aid in his defense caused him actual prejudice and the record does not so reflect. Rather,

the record reflects that Hart, who was appointed as co-counsel in response to Escobedo's motion, vigorously defended Pradia, making appropriate objections and arguing his case alongside Escobedo. Likewise, he does not show that having an investigator for the defense amounted to deficient performance or was detrimental to his case.

Similarly, although Pradia faults trial counsel for filing a motion in limine to limit the admission of his statements to police, which Pradia believes were favorable to him, he does not show that the favorable statements would have been admitted over the State's objection. As another district court in the Fifth Circuit has observed, "'[t]ypically, a party's self-serving, exculpatory, out-of-court statement is inadmissible hearsay.'" *Dyke v. Dir., TDCJ-CID*, No. CV 5:13CV96, 2014 WL 6602281, at *5 (E.D. Tex. Nov. 19, 2014) (quoting *United States v. Doxy,* 225 F. App'x 400, 402 (7th Cir. 2007)). The hearsay rule prohibits admitting out-of-court statements for the truth of the matter asserted without subjecting the speaker to cross-examination. *United States v. Ortega,* 203 F.3d 675, 682 (9th Cir. 2000) (citing *United States v. Fernandez,* 839 F.2d 639, 640 (9th Cir. 1988)). Pradia cannot show that his purportedly favorable and/or "exculpatory" statements to police were not self-serving and would have been admitted over a hearsay objection, absent him testifying and being subjected to cross-examination. Counsel was not deficient by filing such a motion, especially given the fact that Pradia did not choose to testify. *See Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006) (holding that counsel was not deficient in failing to present a meritless argument) (citation omitted); *Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not

issue from, failure to raise a legally meritless claim."). Pradia does not show that the state's rejection of this claim was an unreasonable application of *Strickland*.

Regarding Pradia's claim that trial counsel failed to protect and preserve his due process rights by failing to cross-examine Rachel adequately or to admit her statement to police, the record contradicts this claim. The record reflects that trial counsel, on cross-examination, elicited testimony from Rachel that, among other things: (1) she bonded him out and that he lived with her after he was charged with the murder (Doc. No. 11-9, Reporter's Record Vol. 6 ("RR 6") at 29); (2) Rachel, Pradia, and Jeremy were all yelling or screaming at each other in a heated altercation before the shooting (*Id.* at 46-49, 78-80); (3) Jeremy, who was 6 feet 5 inches tall and close to 300 pounds, was significantly taller and larger than Pradia and was walking up to them with a raised voice (*Id.* at 45); and (4) Rachel had been a victim of domestic violence in the past, so "[a]nytime a man raises his hands and his voice, I [Rachel] feel threatened" (*Id.* at 133). Pradia fails to show that trial counsel's cross examination of Rachel fell below reasonable standards of competence or that the cross examination caused him actual harm.

To the extent that Pradia complains that trial counsel was ineffective for failing to present the victim's texts and conduct, he does not show that any of the texts would have been admitted over a hearsay objection. Counsel is not deficient for failing to advance a motion that would be futile. *See Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) ("Counsel is not required to engage in the filing of futile motions."). Pradia fails to show that counsel's trial decisions fell below a reasonable standard of attorney performance or

that, but for counsel's errors, the result of the trial would have been different. Finally, he fails to meet his burden to show that the state court's adjudication of his ineffective assistance of counsel claims was contrary to, or an unreasonable application of *Strickland*. Therefore, his ineffective assistance of counsel claims must be dismissed.

## IV. CERTIFICATE OF APPEALABILITY

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner. *See* 28 U.S.C. § 2253. A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). For reasons set forth above, this court concludes that jurists of reason would not debate whether the Court's ruling in this case was correct. Therefore, a certificate of appealability will not issue.

## V. CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1. Petitioner's petition is **DISMISSED** with prejudice.

2. All other motions, if any, are **DENIED**.

3. A certificate of appealability is **DENIED**.

The Clerk will enter this Order, providing a correct copy to all parties of record.

SIGNED on this 18th day of August 2026.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE